## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS

ANNIE THORNTON, individually and on behalf of
all similarly situated,

                 Plaintiff,

v.

TYSON FOODS, INC.

                 Defendant.

No. 5:22-cv-5077 (TLB)

## DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO  PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION

### AKERMAN LLP

Damien P. DeLaney
California Bar No. 246476
E-mail:  damien.delaney@akerman.com
601 West Fifth Street, Suite 300
Los Angeles, CA 90071
Telephone: (213) 533-5920
Facsimile:  (213) 627-6342

***Attorneys for Defendant***

70663570;3

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND .............................................................................................................. 1

    A.    UKG Is Attacked by Hackers Resulting In Six Weeks of Downtime. ............................ 1

    B.    Tyson Immediately Responds to UKG Shutdown By Creating Solutions To Ensure Employee Pay Is Not Disrupted. ................................................................. 2

ARGUMENT ................................................................................................................. 6

I.    THORNTON'S MOTION FOR CONDITIONAL CERTIFICATION SHOULD BE DENIED ....................................................................................................... 6

    A.    Legal Standard ............................................................................................ 6

    B.    Plaintiffs' Motion Fails Because Thornton Is Not Similarly Situated To The Proposed Collective. ..................................................................................... 9

    C.    Plaintiffs' Motion Fails Because Many Individual, Fact-Specific Determinations Cannot Be Adjudicated Collectively. .............................................................. 13

II.    THORNTON'S PROPOSED COLLECTIVE DEFINITION AND NOTIFICATION METHODS ARE IMPROPER .............................................................................. 15

    A.    The Court Should Reject Thornton's Overly Broad Proposed Definition of The Collective .................................................................................................. 15

    B.    Thornton's Proposed Distribution of Notice Via Email and Text Message is Unnecessary .............................................................................................. 17

    C.    Thornton's Proposed Follow-up Notices Are Redundant and Unnecessary ................. 17

    D.    The Opt-in Period Should Be No More Than 45 days........................................... 18

CONCLUSION.............................................................................................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Wenco Ashland, Inc.*,
    1:19CV1544, 2020 WL 2615514 (N.D. Ohio May 22, 2020)................................................18

*Baden-Winterwood v. Life Time Fitness*,
    No. 2:06 CV 99, 2006 WL 2225825 (S.D. Ohio Aug. 2, 2006) ..............................................18

*Brown v. Trinity Prop. Mgmt., LLC*,
    No. 4:19-CV-617-LPR, 2019 WL 6834018 (E.D. Ark. Dec. 13, 2019)...........................16, 17

*Buford v. Superior Energy Servs., LLC*,
    No. 4:17-CV-00323-KGB, 2018 WL 6441097 (E.D. Ark. June 1, 2018)............................6, 7

*Butcher v. Delta Mem'l Hospital*,
    No. 5:12CV00241 SWW, 2013 WL 1668998 (E.D. Ark. Apr. 17, 2013)......................7, 8, 14

*Craven v. Neeley's Serv. Ctr., Inc.*,
    No. 4:19-CV-4115, 2020 WL 2046383 (W.D. Ark. Apr. 28, 2020) ......................................16

*England v. New Century Financial Corp.*,
    370 F. Supp. 2d 504 (M.D. La. 2005)...................................................................................13

*Gaul v. Accura Health Ventures, LLC*,
    2023 WL 312369 (S.D. Iowa 2023)..............................................................12, 13, 15, 16

*Greenwell v. R Wings R Wild, LLC*,
    No. 4:15-cv-742-DPM, 2016 WL 3742315 (E.D. Ark. July 7, 2016) ...................................17

*Hopkins v. Calais Forest Equity Enterprises, LLC*,
    No. 4:21-CV-0024- LPR, 2021 WL 4953248 (E.D. Ark. Oct. 25, 2021) ...................8, 10, 14

*Huey, et al. v. Trinity Property Management, LLC*,
    No. 4:20-cv-00685-LPR, ECF Doc. 27 (E.D. Ark. June 14, 2021)........................................17

*Madden v. Lumber One Home Center of Stuttgart, Inc.*,
    No. 10CV01162 JLH, 2010 WL 4974971 (E.D. Ark. Dec. 2, 2010) .......................................8

*McLendon v. Schlumberger Tech. Corp.*,
    No. 4:15CV00752 JLH, 2016 WL 3911897 (E.D. Ark. July 15, 2016) ...................................8

*Mitchell v. Brown's Moving & Stor. Inc.*,
    4:19-CV-00783-LPR, 2021 WL 7541483 (E.D. Ark. Jan. 11, 2021)......................................10

*Olsen v. Clay County*,
   No. 3:18-CV-00129 BSM, 2018 WL 6004660 (E.D. Ark. Nov. 15, 2018)............................17

*Parker v. Rowland Express, Inc.*,
   492 F. Supp. 2d 1159 (D. Minn. 2007) ................................................................................8, 9

*Purdham v Fairfax County Pub. Schools*,
   629 F. Supp. 2d 544 (E.D. Va. 2009) ....................................................................................13

*Putman v. Galaxy 1 Mktg., Inc.*,
   276 F.R.D. 264 (S.D. Iowa 2011) ..........................................................................................18

*Singer v. City of Waco*,
   324 F.3d 813 (5th Cir. 2003) .................................................................................................15

*Sisson v. Salvation Army*,
   No. 6:14-CV-6090, 2015 WL 13358294 (W.D. Ark. July 7, 2015)........................................10

*Smart v. City of Hughes*,
   No. 2:19-CV-00047-KGB, 2020 WL 3451656 (E.D. Ark. June 24, 2020)..................8, 10, 14

*Smith v. NPMC*,
   No. 4:19-CV-00245 BSM, 2020 WL 836484 (E.D. Ark. Feb. 6, 2020) ................................17

*West v. Border Foods, Inc.*,
   No. 05-2525, 2006 WL 1892527 (D. Minn. July 10, 2006) ............................................11, 13

## Statutes

29 U.S.C. § 216(b) ......................................................................................................................6

Fair Labor Standards Act ....................................................................................................... passim

**INTRODUCTION**

After suffering an unexpected outage to its payroll system due to an unprecedented ransomware attack on a third-party vendor, defendant Tyson Foods, Inc. ("Tyson") responded immediately to the outage, working to ensure that pay was not disrupted for approximately 17,000 affected employees. Tyson then audited the workaround procedure it implemented and reconciled employees' earnings against the hours that they worked. That audit found that, based on their actual hours worked, more than two-thirds of the affected employees were paid *more* than they were entitled to receive, a loss that Tyson never sought to recover. Of the approximate 6,700 employees who were not paid all wages owed, Tyson paid the employees the difference as soon as the correct wages were confirmed.

All Tyson employees have been fully compensated for all work performed. This lawsuit is solely about liquidated damages and attorneys' fees. Annie Thornton claims that she was underpaid for certain workweeks and seeks to conditionally certify a nationwide collective class consisting of all 17,000 employees, regardless of whether they worked in the same place, whether they worked overtime, and whether they received the correct payments.  In fact, not only was Ms. Thornton fully paid, but ultimately was *overpaid* $145.00.  Plaintiff's motion for conditional certification should be denied because (1) Thornton is not similarly situated to the proposed collective and (2) many individual, fact-specific issues exist that make collective treatment inappropriate.

**BACKGROUND**

**A.      UKG Is Attacked by Hackers Resulting In Six Weeks of Downtime.**

In December 2021, a Tyson vendor, Ultimate Kronos Group – Kronos Private Cloud ("UKG"), a reputable workforce management service that provides, among other things, time and attendance support for numerous public and private entities nationwide, was taken offline because

1

of a ransomware attack. Coulson Decl. ¶¶ 3, 6.[1]  Sixteen subsidiary companies of Tyson rely on UKG for collecting time and attendance data, and as a result, those subsidiaries' payroll systems were disrupted for approximately six weeks by cybercriminals. *Id.* ¶¶ 4, 7.  The ransomware attack had widespread effects on UKG's systems, affecting service for approximately eight million workers nationwide, approximately 17,000 of whom worked for Tyson subsidiaries. *Id.* This shutdown meant that Tyson could not access employees' time records to make weekly payroll. *Id.* ¶ 7. The shutdown lasted approximately six weeks (between about December 11, 2021, through about January 15, 2022). *Id.*

### B. Tyson Immediately Responds to UKG Shutdown By Creating Solutions To Ensure Employee Pay Is Not Disrupted.

At Tyson, most employees are paid on a weekly basis and the established workweek for these employees is from Sunday to Saturday. *Id.* ¶ 5. Accordingly, employees' hours worked from the previous week are reported on Monday and processed on Tuesday, and employees are paid on Thursday. *Id.* As soon as Tyson learned of the UKG attack and its impact on its time data collection, Tyson took various measures to keep accurate records of employee work hours and to promptly pay weekly wages. *Id.* ¶ 8.

First, since the weekly wages were due on December 14, 2021, for the week of December 5 through 11, Tyson took the following measures to ensure employees were sufficiently and promptly paid:

- For most employees, Tyson assumed the employees worked the same number of hours as they did on the preceding week of November 28 through December 4 ("December 7 Pay Period") and replicated the wages paid on December 7, 2021 for the December 14, 2021 weekly wage.

- Additionally, for those employees who did not work at least 40 hours for the December 7 Pay Period, Tyson, giving employees the benefit of the doubt, assumed that

---

[1] References to the Declaration of Rusty Coulson submitted in support of Tyson's opposition to Thornton's motion for collective certification are hereinafter cited as "Coulson Decl. []".

employees worked 40 hours and paid for 40 hours in their December 14, 2021 wage payment.

- Moreover, for terminated or new employees, Tyson assumed that they worked 8 hours a day (*i.e.*, maximum number of hours worked for each shift) for the days they were employed during the week of December 5 through 11 and paid accordingly.

*Id*. ¶ 9.

Second, to accurately capture employees' hours worked during the UKG outage, Tyson immediately implemented an alternative timekeeping method of manually tracking employees' hours worked and calculating employees' incentives and premiums. *Id*. ¶ 10. Specifically, Tyson asked each of the affected plants to manually record employee hours worked at various timeclock check points and import that data into the excel spreadsheets to manually calculate and issue weekly payroll. *Id*.

Third, to provide another layer of accuracy in the report of employees' hours worked, Tyson asked employees in plants that had sufficient memory to locally store time punches, to continue to clock in and out using the local time clocks. *Id*. ¶ 11. By implementing this method to additionally track employees' hours worked, Tyson ensured that it would be able to go back and reconcile manually recorded work time during the outage with the data recorded in UKG once UKG came back online. *Id*.

Fourth, after the UKG functions were restored, Tyson voluntarily undertook a detailed reconciliation audit for almost six months (*i.e.*, the audit began in January 2022 well before the Complaint was filed in this case) and scrutinized the manual time records, local time clock reports, and payroll records of the affected employees to ensure they were accurately and completely compensated. *Id*. ¶ 12. As to the employees who were identified as not fully compensated because of the UKG outage, they were compensated in full by providing them with reconciliation payments – coded as "1502 Special Gross Pay Adjt" in their pay stubs. *Id*. ¶ 14. To be precise, Tyson found

that a total of 6,700 employees had been underpaid, including Thornton. *Id*. Tyson then, by June 23, 2022, fully compensated each of these employees for any underpayment. *Id*. ¶ 14. It is important to note that 10,300 out of the 17,000 of the employees affected by the UKG shutdown were in fact overpaid (including opt-ins Shanta Love and Jeanous West) and that Tyson did not seek to claw back any overpayments. *Id*. ¶ 13.

In sum, through no fault of its own, Tyson's time keeping system was disrupted by an unprecedented and unanticipated ransomware attack, yet it still managed to keep mostly accurate employee time records and promptly pay employees their weekly wages. However, due to the inherent imperfections of accurately tracking work time for thousands of employees working across 27 facilities in the aftermath of such an unprecedented attack, a minority of the workforce were undercompensated during the Kronos outage. Thereafter, Tyson took painstaking efforts to determine whether any employees were undercompensated because of the attack, and by how much, so it could promptly and fully compensate those employees. In fact, through an abundance of caution, Tyson overpaid most of the employees affected by the UKG attack in its aftermath and did not seek to recoup any overpayment. All employees have been fully compensated for the time worked during the relevant time period.

On April 22, 2022, Thornton—who works for Keystone Foods LLC, a Tyson subsidiary, in the Eufaula facility located in Eufaula, Alabama—filed her Complaint. ECF Dkt. No. 1.[2] Thereafter Thornton, along with six opt-in Plaintiffs (Jenetta Dozier, Shanta Love, Amanda Moore, Danny Supeck Jr., Jeanous West, and Willie Jackson), filed consents to join the case. ECF Dkt. Nos. 6, 7. On May 1, 2023, Thornton filed her Motion for Conditional Certification, which seeks conditional certification of a broad, nationwide collective action. ECF Dkt. No. 1.

---

[2] References to the electronic docket in this case are cited hereinafter as "ECF Dkt. No. []".

Despite Plaintiff's allegations, the Court should reject a collective action encompassing 17,000 employees across the country that worked in different facilities with different managers and different experiences including whether they were underpaid or overpaid. Thornton, along with Love and West, all three of whom worked only in the Eufaula facility for Tyson subsidiary Keystone Foods, LLC during the Kronos outage (Courson Decl. ¶ 15) , all identically speculate in their Declarations that:

> Based on discussions with my co-workers, my familiarity with Tyson's pay practices, my observations and experiences, and the documents Tyson sent to us about the Kronos outage I know that most or all other nonexempt employees for Tyson's who had to use the Kronos system had the same problems being fully and timely paid for the work we did.

Ex. 1, ¶ 19; Ex. 2, ¶ 17; Ex. 3, ¶ 17.[3] These declarations however, provide no basis to conclude Thornton has personal knowledge of the experiences of employees in completely different facilities in different states.  Indeed, the approach to addressing the Kronos outage varied from facility to facility depending on the unique circumstances of those facilities, including whether the time clocks were still functioning to collect time punch data and the timing in which the facility adopted manual time recording. Courson Decl. ¶¶ 9-13. As a result, only 6,700 were underpaid. The fact that Thornton cannot provide evidence to harmonize these varying experiences during the Kronos outage undermines her arguments in favor of certification. Accordingly, and for the reasons set forth below, the Court should deny Plaintiff's Motion for Conditional Certification.

---

[3] References to the Exhibits 1 through 8 attached to the Motion for Conditional Certification are hereinafter cited as "Ex. []."

<u>**ARGUMENT**</u>

**I.     THORNTON'S MOTION FOR CONDITIONAL CERTIFICATION SHOULD BE DENIED**

    **A.     Legal Standard**

The FLSA permits plaintiffs to maintain a collective action "for and [o]n behalf of … themselves and other employees similarly situated." 29 U.S.C. § 216(b). "Many district courts in the Eighth Circuit utilize a two-step approach in collective action cases." *Buford v. Superior Energy Servs.*, *LLC*, No. 4:17-CV-00323-KGB, 2018 WL 6441097, at *2 (E.D. Ark. June 1, 2018) (Baker, J.). First, "[a]t the notice stage [*i.e.*, the conditional certification stage], the court determines, based on the pleadings and affidavits, whether notice should be given to potential class members." *Id*. (emphasis added) (quotations omitted). At this stage, "[t]he key issue is whether the members of the proposed class are similarly situated. If the court allows notification, then a representative class is conditionally certified and notice is sent to the putative opt-in plaintiffs." *Id.* (quotations omitted). "At the second stage, the court determines whether to decertify the class once discovery is largely complete." *Id*. (quotations omitted).

However, two circuit courts have recently acknowledged the flaws of this two-step approach and have adopted a more exacting standard for conditional certification. Specifically, in *Swales v. KLLM Transport Servs., L.L.C*, the Fifth Circuit instructed district courts to authorize preliminary discovery targeted to the material factual and legal considerations that bear on the "similarly situated" inquiry *as early as possible* in a case to assess from the outset whether merits questions can be answered collectively. 985 F.3d 430, 441–42 (5th Cir. 2021). According to the Fifth Circuit, "[w]hen a district court ignores that it can decide merits issues when considering the scope of a collective, it ignores the 'similarly situated' analysis and is likely to send notice to employees who are not potential plaintiffs." *Id*. at 442. "In that circumstance, the district court

risks crossing the line from using notice as a case-management tool to using notice as a claims-solicitation tool." *Id.*

Similarly, the Sixth Circuit in *Clark v. A&L Homecare & Training Ctr., LLC*, admonished district courts that "notice sent to employees who are not, in fact, eligible to join the suit amounts to solicitation of those employees to bring suits of their own." 2023 WL 3559657, at *4 (6th Cir. May 19, 2023). "To the extent practicable, therefore, court-approved notice of the suit should be sent only to employees who are in fact similarly situated." *Id.* "[W]e hold that, for a district court to facilitate notice of an FLSA suit to other employees, the plaintiffs must show a 'strong likelihood' that those employees are similarly situated to the plaintiffs themselves." *Id.*

Accordingly, both the Fifth and Sixth Circuit have recognized that certification of an FLSA collective prior to a court-approved notice must require **exacting scrutiny** as to whether a plaintiff and a putative collective are similarly situated. Although the Eighth Circuit has yet to adopt the standard from either *Swales* or *Clark*, this Court should follow these well-reasoned decisions to require Thornton to show a "strong likelihood" that she is similarly situated to the employees she purports to represent before approving notice to all affected employees. The basis for doing so is compelling in light of the narrowness of Thornton's experience, as a single employee with no personal experience beyond the single facility in which she worked who can offer only vague and unsupported assertions that the experiences of other employees match hers. Under these circumstances, declining to issue notice now avoids "crossing the line from using notice as a case-management tool to using notice as a claims-solicitation tool." *Swales*, 985 F.3d at 442.

Nevertheless, even if the Court decides to follow the two-step approach, Thornton still bears the burden of proof at the conditional certification stage. *See Butcher v. Delta Mem'l Hospital*, No. 5:12CV00241 SWW, 2013 WL 1668998, at *2 (E.D. Ark. Apr. 17, 2013). This

burden is lenient, but it is not "the equivalent of a rubber stamp" and is not "invisible." *Hopkins v. Calais Forest Equity Enterprises, LLC*, No. 4:21-CV-0024- LPR, 2021 WL 4953248, at *2 (E.D. Ark. Oct. 25, 2021); *see also Madden v. Lumber One Home Center of Stuttgart, Inc.*, No. 10CV01162 JLH, 2010 WL 4974971, at *4-5 (E.D. Ark. Dec. 2, 2010) (although the burden of proof is lenient, the plaintiffs provided insufficient evidence to show that other "aggrieved individuals' in addition to the named plaintiffs exist or are similarly situated"). A plaintiff may not rely on "unsupported assertions of additional plaintiffs and widespread FLSA violations" to meet this burden at the notice stage. *Butcher*, 2013 WL 1668998, at *2 (citation omitted).

Moreover, whether a case should proceed as a collective action is not a one-sided inquiry. The Court should consider any facts, especially ones not disputed by the plaintiff, that suggest a collective action would be improper. *See Parker v. Rowland Express, Inc*., 492 F. Supp. 2d 1159, 1165 (D. Minn. 2007) (citing *West v. Border Foods, Inc*., No. 05-2525 (DWF/RLE), 2006 WL 1892527, at *7 (D. Minn. July 10, 2006) (remedial purposes of the FLSA and the interests of judicial economy are not advanced by overlooking facts suggesting a collective action is improper)). When considering the evidence, courts use the following factors to determine whether a plaintiff and the proposed collective members are similarly situated at the notice stage:

> (1) whether the plaintiffs all held the same job titles; (2) whether the plaintiffs worked in different geographical locations; (3) the extent to which the claimed wage-and-hour violations occurred during different time periods and by different decision makers; and (4) whether the plaintiffs all alleged similar, though not identical, wage-and-hour violations.

*Smart v. City of Hughes*, No. 2:19-CV-00047-KGB, 2020 WL 3451656, at *2, 5 (E.D. Ark. June 24, 2020) (declining to grant conditional certification where "the affidavits from a water department employee and a police department employee [were] not sufficient to show that all full-time, hourly-paid employees of defendant [were] similarly situated"); *see also McLendon v. Schlumberger Tech. Corp*., No. 4:15CV00752 JLH, 2016 WL 3911897, at *3 (E.D. Ark. July 15,

8

2016) (finding that the plaintiff's general, conclusory statements of FLSA violations affecting employees at locations other than the four locations at which he worked were insufficient to certify a broad nationwide conditional class).

Ultimately, the power to authorize notice in a collective action "is to be exercised … only in 'appropriate cases,' and remains within the discretion of the district court." *Parker*, 492 F. Supp. 2d at 1163. A collective action should never be "automatic" since, at best, it would be "an inefficient and over-broad application of the opt-in system, and at worst … a substantial and expensive burden on a defendant." *Id.* at 1165.

### B.   Plaintiffs' Motion Fails Because Thornton Is Not Similarly Situated To The Proposed Collective.

Thornton fails to present sufficient evidence that she is similarly situated to the proposed collective. Simply stating that "most or all other nonexempt employees for Tyson's [sic] who had to use the Kronos system had the same problems being fully and timely paid for the work we did," and "I believe that if my co-workers were notified of this lawsuit and their right to challenge this pay practice that many of them would participate," Ex. 1, ¶¶ 19, 22, does not make this an appropriate case for a collective action. Indeed, Thornton's declaration, as well as the substantially identical declarations of Love and West, provide no basis for claiming that all nonexempt employees nationwide were subject to common unlawful policy. In particular, Thornton fails to indicate how, based merely on her "discussions with my co-workers, familiarly with Tyson's pay practices, [her] observations and experiences, and the documents Tyson sent to us about the Kronos outage," (Ex. 1, ¶ 19) she can determine whether thousands of employees across various facilities in different states were not paid timely overtime wages.  Thornton's vague assertion of "discussions" with her co-workers, while no substitute for the sworn declarations of the co-workers themselves, fails even to tell the Court what testimony Thornton believes these individuals would

provide to support their similarity. While asking the Court simply to read between the lines, these declarations provide no specific details on:

1. The positions or job duties or managers of other nonexempt employees at the Eufaula facility or other Tyson facilities.

2. Whether other exempt employees at the Eufaula facility or other Tyson facilities did in fact work over 40 hours a week during the Kronos outage and how often they did so.

3. To what extent certain employees were paid more than what they were owed under the FLSA.

General, boilerplate declarations like the ones submitted by Thornton, Love, and West are not probative of whether other employees are similarly situated as to the overtime violations alleged. Instead, Thornton must provide admissible evidence of those facts in the form of sworn declarations from the employees she claims to be similarly situated, evidence which is missing from her submissions. *See Mitchell v. Brown's Moving & Stor. Inc.*, 4:19-CV-00783-LPR, 2021 WL 7541483, at *3 (E.D. Ark. Jan. 11, 2021) ("This is important because the pay plan alleged in the Complaint is not even potentially violative of the FLSA unless the pay plan resulted in the failure to pay minimum wage or to pay time-and-a-half for overtime. *Therefore, knowledge of the number of hours worked by other employees is vital to any assertion that they are similarly situated to the named Plaintiffs for purposes of conditional certification*.") (emphasis added); *Hopkins*, 2021 WL 4953248, at *2 (finding that the named plaintiff's "'beliefs' utterly fail to connect the dots in a way that even modestly shows a common policy that causes the same or similar FLSA violation to multiple employees"); *Smart*, 2020 WL 3451656, at *3 (denying motion for conditional certification where "the sole evidence of similarly situated employees [was] two similarly worded affidavits by employees with different job titles, different job responsibilities' and who [were] subject to different overtime thresholds") (citations omitted); *Sisson v. Salvation Army*, No. 6:14-CV-6090, 2015 WL 13358294, at *3 (W.D. Ark. July 7, 2015) (denying

10

conditional certification in part because identical affidavits were speculative and conclusory as to whether plaintiff "had regular contact" with others "across the Southern Territory during the course of her employment"); *West*, 2006 WL 1892527 at *6 (a showing that six of the potential class of approximately 240 shift managers employed at defendants' restaurants were allegedly required to work off-the-clock was too limited a sampling of employees to support plaintiffs' assertion of widespread violations resulting from a common plan or policy).

Indeed, the differences between wage payments made to Thornton and the wage payments made to Love and West during the Kronos outage illustrate the distinctions between Thornton's claims and the claims of most members of the proposed collective. Specifically, Thornton was underpaid for the weeks she worked during the UKG outage while West and Love were overpaid during that time period. Courson Decl. ¶¶ 16-19. In other words, West and Love (like most nonexempt Tyson employees) were paid more than what they were owed (whether under the FLSA or based on their agreed-to wages) for hours worked during the UKG outage and were therefore not owed or provided reconciliation payments after the outage. *Id*. ¶¶ 18-19. By contrast, after Tyson discovered that Thornton was paid less than what she was owed during the UKG outage, Tyson made reconciliation payments to Thornton which exceeded the wage loss she experienced during the UKG outage. *Id*. ¶¶ 16-17. Thornton has not supplied the testimony of any other employees who were underpaid during the UKG outage that would permit the Court to assess that those individuals had experiences similar to Thornton's.

Furthermore, Thornton does not even mention the differences in how Tyson calculated the work hours of employees for the first week of the outage as opposed to subsequent weeks, as well as the differences in what workarounds Tyson used during the UKG outage from facility to facility. Indeed, the computation of hours in the first week of the outage may have resulted in different

outcomes for employees depending on whether they worked 40 hours the prior week and whether they were new or terminated employees. Current employees who worked overtime during the week preceding the outage and did not work overtime during the week of the outage would clearly have benefitted. As *Gaul v. Accura Health Ventures, LLC*, 2023 WL 312369 (S.D. Iowa 2023) (on which Thornton heavily relies) observes, this fact provides Tyson a stronger defense to potential wage losses in this week because "it had *no* record of actual hours" making it "not 'practicable' to pay [wages] on the regular payday." *Gaul*, 2023 WL 312369, at *8. Thornton also ignores that workers in some facilities clocked in and out as normal during the UKG outage, while work hours for employees in other facilities were only manually recorded.

The high proportion of employees who ultimately received an overpayment of wages also calls into question an important aspect of certification: whether the purportedly affected employees have any interest in Thornton's action. Indeed, those employees may not perceive any losses from the UKG outage. Because Tyson pays employees on a weekly basis, and paid all affected employees continuously during the outage, to an employee who was ultimately *overpaid*, any delay in receiving some amount of wages in a given workweek would have been minimal. Thornton has offered no evidence, other than her vague assertion of interest among employees she has spoken with, that those employees have any interest in this case. Such evidence is critical to Thornton's certification argument because the *absence* of evidence of interest among the proposed collective is relevant to whether certification is warranted. *See Gaul*, 2023 WL 312369, at *9. Thornton has only obtained seven consents and declarations from two other individuals among the approximately 17,000 employees she claims are interested in this case. This fact amplifies the need for concrete evidence showing sufficient interest in the case.

Moreover, in *Gaul*, the court concluded that there was evidence that the named plaintiff and the proposed collective were similarly situated because the defendant only completed reconciliation payments to the named plaintiff and putative plaintiffs *after* the named plaintiff had filed the lawsuit, indicating "a direct relationship between [named plaintiff]'s experience and those of [the putative collective]." *Id.* at 8. Here, by contrast, Tyson made reconciliation payments to Thornton, but made no reconciliation payments to other employees who were overpaid during the UKG outage. Therefore, there is no "direct relationship" between Thornton's experience and the experience of these employees.

Because Thornton has provided the Court with no basis to support her claim that she and a collective of all nonexempt Tyson employees nationwide are similarly situated regardless of facilities, job responsibilities, managers, schedules, or overtime worked, the Court should deny Thornton's motion for conditional certification.

### C. Plaintiffs' Motion Fails Because Many Individual, Fact-Specific Determinations Cannot Be Adjudicated Collectively.

Even if Thornton could show that she and members of the proposed collective are similarly situated, the Motion for Conditional Certification should be denied because of the "[n]ecessity of [i]ndividualized determinations" in this case. *Purdham v Fairfax County Pub. Schools*, 629 F. Supp. 2d 544, 549 (E.D. Va. 2009); *West*, 2006 WL 1892527, at *9 (denying conditional certification of plaintiffs' off-the-clock claims considering "individualized nature of the alleged violations") (collecting cases); *England v. New Century Financial Corp.*, 370 F. Supp. 2d 504, 511-12 (M.D. La. 2005) (finding conditional certification improper in a case where off-the-clock claims of loan officers involved a multitude of different managers at different locations, and where liability at one location would not necessarily require a finding of liability at another location).

Specifically, if the proposed collective is certified, the focus would not be on any purported unlawful common policy or practice Tyson set in motion during the UKG outage, but whether (1) estimating hours worked for individual nonexempt employees during the first week of the UKG outage accurately captured their actual hours worked; (2) each facility accurately captured each hour worked by nonexempt employees through manual timekeeping; and (3) any nonexempt employee worked over 40 hours per workweek during the outage and, if so, whether they were timely paid for overtime hours worked.

Contrary to Thornton's argument, "[s]imply pointing to an asserted common policy … is not enough to get conditional certification where there is nothing to show that the policy caused an actual FLSA violation with respect to multiple employees." *Hopkins*, 2021 WL 4953248, at *2. Indeed, neither estimating an employee's work hours based on a previous workweek nor tracking an employee's work hours manually are *per se* violations of the overtime provisions of the FLSA, even where an employee was allegedly denied their agreed-to wages as a result. *See Butcher*, 2013 WL 1668998, at *8 n.5 ("Absent a minimum wage/maximum hour violation, we find no remedy under the FLSA for pure gap [straight] time claims.").

Here, there is substantial variation in, among other things, the (1) amount of hours employees worked in any given workweek during the Kronos outage; (2) whether their work hours during their workweek immediately prior to the Kronos outage accurately reflected their work hours during the first week of the Kronos outage; and (3) accuracy of manual timekeeping undertaken by each facility during the Kronos outage. These key differences will inevitably require the Court to conduct fact-intensive liability and damages inquiries into each claim, further showing why proceeding as a collective action is inappropriate in this case. *See Smart*, 2020 WL 3451656, at *3 ("Numerous federal district courts have declined to conditionally certify a collective action

where, as here, 'determining whether putative plaintiffs are similarly situated will depend on a fact-intensive inquiry into the duties performed by each individual employee.'").

Thornton argues that Tyson's approach to compensating employees during the Kronos outage amounted essentially to a payment-in-arrears across-the-board to all employees affected by the Kronos outage.  She relies primarily on *Gaul* to argue that Tyson improperly relied upon an aggregated method of computing net underpayment over the full period of the Kronos outage. There is no evidence, however, that this approach uniformly resulted in applying "an overpayment or withholding error in a subsequent pay period [to] offset an FLSA violation from an earlier period," as the Court questioned in *Gaul*. *Id*. at *8. Indeed, in many (if not most) situations, Tyson equally applied overpayments in an *earlier* pay period to offset underpayments in *subsequent* pay periods. Courson Decl. ¶ 13. While late payment of wages may arguably violate the FLSA, *early* payment of wages does not, and an employer may, at least, rely on advance overpayment of wages to offset future underpayments.  *See Singer v. City of Waco*, 324 F.3d 813, 828 (5th Cir. 2003). Thus, in this case, the Court would need to conduct individual inquiries to distinguish individual pay periods where overpayment preceded underpayment.

Given the unavoidably fact-intensive nature of Thornton's claims and since Thornton has not met her burden of showing others are similarly situated to her, this case is not a proper collective action. Accordingly, the Court should deny Thornton's motion for conditional certification.

## II.    THORNTON'S PROPOSED COLLECTIVE DEFINITION AND NOTIFICATION METHODS ARE IMPROPER

### A.    The Court Should Reject Thornton's Overly Broad Proposed Definition of The Collective

As set forth above, Thornton does not meet the standard for granting conditional certification. Nevertheless, if the Court finds that conditional certification of a collective action is appropriate, Tyson objects to the scope of Thornton's proposed collective definition.

First, the proposed collective definition is overbroad in that it covers all nonexempt Tyson employees employed during the UKG outage regardless of whether they worked any overtime in a workweek affected by the UKG outage. *See* ECF Dkt. No. 23-1. Second, the definition covers Tyson facilities nationwide even though Thornton has not proven that she is similarly situated to any individual who worked outside of the Eufaula facility. *Id*. Third, the definition should be revised to specify January 15, 2022, as the end date of the pay periods affected by the UKG outage.

Accordingly, at most, a proposed collective can only include nonexempt employees employed with Keystone Foods LLC at the Eufaula facility who worked more than 40 hours in any workweek from December 11, 2021, through January 15, 2022. *See Gaul*, 2023 WL 312369 at *10 ("notice should include at least an approximation of the end date of the pay periods affected by the UKG outage to ensure recipients understand the narrow time period at issue"); *Brown v. Trinity Prop. Mgmt., LLC*, No. 4:19-CV-617-LPR, 2019 WL 6834018, at *5 (E.D. Ark. Dec. 13, 2019) (noting that the scope of a proposed collective should be narrowed when "there is no basis anywhere in the evidence to suggest that the extensive and widespread groups of individuals covered by the[] purported collective[] are similarly situated to the named [plaintiff]"); *Craven v. Neeley's Serv. Ctr., Inc*., No. 4:19-CV-4115, 2020 WL 2046383, at *3 (W.D. Ark. Apr. 28, 2020) (narrowing scope of the collective to the plaintiff's only work location because he never worked at the defendants' other location, failed to present any evidence of personal knowledge concerning the other location, and otherwise failed to show that he was similarly situated to employees at the other location).

**B.      Thornton's Proposed Distribution of Notice Via Email and Text Message is Unnecessary**

Because distribution of notice via U.S. mail is an appropriate and effective manner for reaching most putative members of the collective action, Tyson objects to Thornton's request for the disclosure of potential opt-in plaintiffs' email addresses and cell phone numbers. *See, e.g.*, *Brown*, 2019 WL 6834018, at *8 ("'[m]ailing notice will allow the greatest number of potential class members to receive notice while minimizing redundancy'" and avoid "undue invasions of privacy and undue pressure that can come with multiple messages through multiple avenues") (quoting *Israsena v. Chalak M&M AR1 LLC*, No. 4:15CV00038 JLH, 2015 WL 13648567, at *5 (E.D. Ark. Oct. 14, 2015)); *Olsen v. Clay County*, No. 3:18-CV-00129 BSM, 2018 WL 6004660, at *2 (E.D. Ark. Nov. 15, 2018) ("[p]roviding notice to possible opt-in plaintiffs through U.S. mail via letter or postcard is sufficient[.]); *Huey, et al. v. Trinity Property Management, LLC*, No. 4:20-cv-00685-LPR, ECF Doc. 27 at 15 (E.D. Ark. June 14, 2021) (denying request to provide notice and consent to join form via email).

**C.      Thornton's Proposed Follow-up Notices Are Redundant and Unnecessary**

Thornton's request to send a reminder mail, email, and text should be denied "to avoid redundant notice and any conduct that could be interpreted as an endorsement of the lawsuit." *Smith v. NPMC*, No. 4:19-CV-00245 BSM, 2020 WL 836484, at *2 (E.D. Ark. Feb. 6, 2020); *see also Olsen*, 2018 WL 6004660, at *2 (citing *Knispel v. Chrysler Grp. LLC*, No. 11-CV11886, 2012 WL 553722, at *8 (E.D. Mich. Feb. 21, 2012) (denying reminder notices "because they are unnecessary and could potentially be interpreted as encouragement by the Court to join the lawsuit.")); *see also Greenwell v. R Wings R Wild, LLC*, No. 4:15-cv-742-DPM, 2016 WL 3742315, at *1 (E.D. Ark. July 7, 2016) ("There's no need for a follow-up notice. The Court is confident that, if folks want to join the lawsuit, they will know how.").

### D.   The Opt-in Period Should Be No More Than 45 days

If a collective action is conditionally certified, Thornton's request for a 60-day opt-in period should be denied. Courts regularly hold an opt-in period of 45 days to be an appropriate amount of time for potential members of the collective to join an action. *See Adams v. Wenco Ashland, Inc*., 1:19CV1544, 2020 WL 2615514, at \*9 (N.D. Ohio May 22, 2020); *Putman v. Galaxy 1 Mktg., Inc*., 276 F.R.D. 264, 277 (S.D. Iowa 2011) (granting 45-day opt-in period); *Baden-Winterwood v. Life Time Fitness*, No. 2:06 CV 99, 2006 WL 2225825, at \*3 (S.D. Ohio Aug. 2, 2006) (noting that "sixty (60) days is too long and would needlessly delay the litigation").

## <u>CONCLUSION</u>

For all of the foregoing reasons, the Court should deny Thornton's Motion for Conditional Certification in its entirety.


Dated:  May 30, 2023            Respectfully submitted,


By:*/s/ Damien P. DeLaney*
Damien P. DeLaney
California Bar No. 246476
E-mail:  damien.delaney@akerman.com
**AKERMAN LLP**
601 West Fifth Street, Suite 300
Los Angeles, CA 90071
Telephone: (213) 533-5920
Facsimile:  (213) 627-6342
*Attorneys for Defendant*

18

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 30, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel and parties of record identified on the below Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically filed Notices.

By: <u>*/s/ Damien P. DeLaney*</u>
Damien P. DeLaney
California Bar No. 246476

19

70663570;3

**SERVICE LIST**
*Annie Thornton vs. Tyson Foods, Inc.*
*Case No.: 5:22-cv-5077-TLB*
*United States District Court, Western District of Arkansas*

Matthew Scott Parmet, Esq.
**PARMET PC**
3 Riverway, Ste. 1910
Houston, TX 77056
Telephone: (713) 999-5228
Facsimile: (713) 999-1187
Email: matt@parmet.law

*Attorney for Plaintiff*

70663570;3