**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**ANNIE THORNTON, Individually and on**
**Behalf of All Others Similarly Situated**                                      **PLAINTIFFS**

**V.**                                    **CASE NO. 5:22-CV-5077**

**TYSON FOODS, INC.**                                                      **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiffs' Unopposed Motion to Approve Amended Settlement Agreement (Doc. 62) and Memorandum Brief in Support (Doc. 63). Three years ago, Plaintiffs brought a claim under the Fair Labor Standards Act ("FLSA"). *See* Doc. 2. In mid-2023, this Court conditionally certified the collective action pursuant to 29 U.S.C. § 216(b). *See* Doc. 33. In February 2024, Plaintiffs filed their initial motion for approval (Doc. 48). Following a hearing on the motion, Plaintiffs withdrew the initial motion in order to modify some of the terms with which the Court expressed concern. In October 2024, Plaintiffs filed the instant Motion, (Doc. 62); for the reasons stated herein, the Motion is **GRANTED**, and the Amended Settlement Agreement is **APPROVED**.

## I.  BACKGROUND

This case arises out of a wage-and-hour dispute. Plaintiffs allege that Tyson's response to a cyberattack on its timekeeping system, Kronos, resulted in delayed or unpaid wages from December 11, 2021, to January 15, 2022. More specifically, Plaintiffs allege that Tyson "adopted uniform polices with respect to calculating employee wages," such as duplicating prior pay periods and using a manual timekeeping system that resulted in resulted in payment violations. (Doc. 63, p. 13). Ultimately, some employees were net-underpaid while others were net-overpaid.

1

Tyson denies all wrongdoing, and Plaintiffs' brief makes clear that Tyson "completed a reconciliation," through which it paid out 100% of the unpaid and delayed wages. *Id.* Because "Tyson has already paid Plaintiffs and putative collective members any outstanding wages, . . . liquidated damages [are] the only available remedy," as permitted by 29 U.S.C. § 216(b). *Id.* at p. 16.

The Amended Settlement Agreement accomplishes the following for Plaintiffs and the putative collective members: (1) Tyson will create a new settlement fund of $2,050,000.00 that will be distributed to collective members; and (2) Tyson will forgive approximately $2,773,701.62 in wages that were overpaid to putative collective members and which Tyson may otherwise have been able to recoup. Accordingly, the total value of the settlement is $4,823,701.62. The parties estimate that approximately 17,000 employees were affected and may opt in to the collective. For the employees that were ultimately net-overpaid, the new settlement fund will provide a single $30 payment for liquidated damages. For employees that were net-underpaid, the new settlement fund will provide a pro rata payment that will amount to at least $40 each.

Additionally, the Amended Settlement Agreement provides for the following fees and costs, which will be distributed from the new settlement fund:

- Service Awards totaling $10,000—including $5,000 to named plaintiff, Annie Thornton and $2,500 each to opt-ins Shanta Love and Jeanous West;

- Attorneys' fee award of $820,000, which amounts to 17% of the gross settlement value and 40% of the new settlement fund;

- Litigation costs totaling $7,897.03 to compensate Plaintiffs' attorneys for the out-of-pocket expenses that they fronted in this case; and

- Administrative costs estimated to be $78,985.00.

After the above fees and costs are distributed from the fund, Plaintiffs and collective members will still recover 62% of their total potential liquidated damages (85% when taking into account the forgiven overpayments).[1]

The Settlement Administrator will issue Notice of Settlement and Settlement Awards (via check) to the putative class within fourteen days of the Administrator's receipt of the Collective List and funds in the Qualified Settlement Fund. (Doc. 63-1, p. 7). Each check shall be valid for ninety days, and putative members may opt in by merely cashing the check. *Id.* Following the initial distribution, the Administrator will redistribute any unclaimed amounts to the opt-ins; each redistribution check will be valid for sixty days. *Id.* Any portion of the settlement amount that is unclaimed by members of the collective after the second deadline for the issuance of redistribution checks will be remitted as *cy pres* to the National Employment Law Project, Legal Aid of Arkansas, the Center for Arkansas Legal Services, and/or another beneficiary selected by Plaintiffs, subject to the reasonable approval of Tyson. *Id.* at pp. 7–8.

Regarding the disbursement of attorneys' fees and costs, the Settlement Administrator shall disburse 80% when the first round of checks are issued to putative class members. (Doc. 63-1, p. 7). The remaining 20% will be withheld until after the Final Accounting Date. *Id.* at p. 9.

In exchange for the above, Plaintiffs and putative collective members will release Tyson from all claims, federal and state, regarding the Kronos outage during the relevant time period. *See* Doc. 63-1, pp. 1–13.

---

[1] Tyson stated in the settlement hearing that its exposure for liquidated damages was approximately $1.8 million. After all fees, costs, and awards are subtracted from the new settlement fund, there is approximately 62% of $1.8 million remaining.

## II.  LEGAL STANDARD

Before a court approves an FLSA settlement agreement, it must determine that "the litigation involves a bona fide dispute and that the proposed settlement is fair and equitable to all parties." *Shepardson v. Midway Indus., Inc.*, 2019 WL 2743435, at *2 (W.D. Ark. July 1, 2019) (quoting *Boland v. Baue Funeral Home Co.*, 2015 WL 7300507, at *2 (E.D. Mo. Nov. 18, 2015)). "A settlement addresses a bona fide dispute when it reflects a reasonable compromise over issues that are actually in dispute." *Stainbrook v. Minn. Dep't of Pub. Safety*, 239 F. Supp. 3d 1123, 1126 (D. Minn. 2017) (citing *D.A. Schulte, Inc. v. Gangi*, 328 U.S. 108, 115 (1946)).

If the court determines that there is a bona fide dispute, it must next determine that the agreement purporting to settle that dispute is fair and reasonable to all parties. Such a determination usually involves considering:

> [1] the stage of the litigation and amount of discovery exchanged, [2] the experience of counsel, [3] the probability of plaintiffs' success on the merits, [4] any 'overreaching' by the employer in the settlement negotiations, and [5] whether the settlement was the product of arm's length negotiations between represented parties based on the merits of the case.

*Shepardson*, 2019 WL 2743435, at *2 (citing *King v. Raineri Constr., LLC*, 2015 WL 631253, at *2 (E.D. Mo. Feb. 12, 2015)).

## III.  DISCUSSION

### A.  Fair and Reasonable Resolution of a Bona Fide Dispute

The Court finds that the Amended Settlement Agreement resolves a bona fide dispute between Plaintiffs and Tyson. This settlement was negotiated approximately one-and-one-half years into litigation, requiring two full-day mediations nine months apart to reach a consensus. (Doc. 63, p. 14). Additionally, after the Court noted several concerns

4

during a hearing on the initial motion, the parties continued to negotiate. Though the parties have reached a settlement, Tyson continues to deny any wrongdoing and the appropriateness of both certification and liquidated damages. *Id.* at pp. 12, 21, 23. Thus, the Agreement "reflects a reasonable compromise over issues that are actually in dispute." *Stainbrook*, 239 F. Supp. 3d at 1126 (citing *D.A. Schulte, Inc.*, 328 U.S. at 115).

The Court further finds that the Amended Settlement Agreement is fair and reasonable. As to the first factor—the stage of litigation and amount of discovery—the Court notes that this case settled during litigation after substantial investigatory work by both parties and contested motion practice. *See* Doc. 63, pp. 20–21 (listing various work undertaken by counsel in this case). Had the case not settled when it did, there would be far more work ahead for both sides, including additional motion practice and preparing for trial. In other words, the litigation had progressed to a point where the parties "underst[oo]d the potential recovery and relative risks of proceeding to trial with their claims," *King*, 2015 WL 631253, at *3, but not so far that "the parties will not realize significant benefits by settling." *Id.* (quoting *Fry v. Accent Mktg. Servs., L.L.C.*, 2014 WL 294421, at *1 (E.D. Mo. Jan. 27, 2014)). On the second factor, the Court finds that Plaintiffs' counsel have shown themselves to be highly experienced in wage-and-hour disputes and, specifically, litigation involving the Kronos outage. *See* Doc. 63, pp. 21–22 (citing thirteen cases Plaintiffs' counsel have litigated and settled regarding the Kronos outage).

As to the third factor, probability of success on the merits, Plaintiffs note that ongoing litigation could take years, with no guarantee of success, and that proceeding to trial presents a "heightened" risk due to Tyson's "good faith" argument against liquidated

5

damages. (Doc. 63, pp. 23). Because the Amended Settlement Agreement contemplates releasing Tyson from all state and federal claims, Plaintiffs' briefing discusses the probability of success on the merits in Maryland, Maine, Ohio, and California as these states have sizable numbers of putative collective members and state remedies that could exceed FLSA recovery. *Id.* at pp. 26–30. Plaintiffs note that each of these states has a bar on liquidated damages that could apply in this case and, thus, materially affect the probability of success in state actions. *See id.* Weighing the probability of success on the merits against the results obtained through the settlement, again, reflects a fair and reasonable settlement. Following completion of the settlement, after all fees and costs are paid out of the new settlement amount, Plaintiffs and putative collective members will have been compensated 62% of their potential liquidated damages, after having already been repaid 100% of their unpaid or underpaid wages.[2] Additionally, Tyson will not be able to recoup net-overpaid wages from collective members that opt in.

As to the fourth and fifth factors, this Agreement was negotiated between the parties' qualified attorneys who utilized a wage-and-hour mediator. *Id.* at p. 33. The final terms stemmed from a proposal by the mediator, which the two parties independently vetted before agreeing to it. *Id.* Additionally, following a hearing on the initial motion for approval, counsel continued negotiations to further shore up fairness to the putative collective. For example, the amended settlement includes an easier opt-in process, and rather than the remaining funds reverting to Tyson, it includes a second round of

---

[2] As previously stated, when taking the forgiven overpayments into account, the recovery of liquidated damages, per the Motion, is 85%. *See Askar v. Health Providers Choice, Inc.*, 2021 WL 4846955, at *4 (N.D. Cal. Oct. 18, 2021) (stating that a common fund that was inclusive of fees, costs, and awards and totaled 50% of potential damages was "well over the range of percentage-based recoveries other courts have found acceptable").

distributions to the opt-ins and a *cy pres*. *Id.* at pp. 41–42. Counsel on both sides engaged in independent research on "hotly debated" legal and factual issues, and both sides were persuaded to reach a compromise based on an appreciation for the risks of litigation in this case. (Doc. 63, pp. 33–34). There is no evidence of overreach by Tyson, and the settlement appears to be a fair and reasonable agreement resulting from arms-length negotiations on the merits. Accordingly, the Court finds that the Amended Settlement Agreement is a fair and reasonable compromise of a bona fide dispute.

### B. Notice and Consents

The Court approves the proposed notice and consent process set forth by the parties. The proposed Notice Form instructs putative collective members on their rights and the opt-in process. And the opt-in process has been simplified to encourage participation by requiring the putative members only to sign and cash their checks to opt in.

The Court does note some typographical errors in the Notice Form and settlement check language.[3] The Amended Settlement Agreement allows for modifications to correct such errors, *id.* at p. 5 n.1, so provided these errors are corrected, the Court approves the Notice Form and settlement check language.

---

[3] Both item 5 and item 9 of the Notice Form mention the "claim form." (Doc. 63-1, p. 19 ("What happens if I complete the claim form?"); *id.* at p. 20 (instructing putative members to contact the administrator if they have questions about the status of their claim form)). These seem to be holdovers from the initial, pre-amended Notice Form, as the Amended Settlement Agreement only requires the putative collective members to cash the check to opt in. Additionally, the settlement check language incorrectly states that this matter is in "(D. Ark.)"; it is, of course, in the *Western* District of Arkansas. *Id.* at p. 16.

### C.  Fees and Costs to be Distributed from the New Settlement Fund

#### 1.  Service Awards

The Service Awards requested by the parties are in keeping with others awarded in the Eighth Circuit. *See, e.g.*, *Caligiuri v. Symantec Corp.*, 855 F.3d 860, 868 (8th Cir. 2017) (upholding $10,000 service award to each named plaintiff in class action settlement where the plaintiffs "participated in interviews, assisted with discovery, were deposed, participated in conferences, and met with attorneys throughout the litigation process that lasted five years"); *Murphy v. Ajinomoto Windsor, Inc.*, 2018 WL 11312002, at *2 (E.D. Mo. Mar. 26, 2018) (approving a $5,000 class representative award as fair and reasonable based on the representative's "substantial contribution" in an FLSA case).

Here, the Amended Settlement Agreement contemplates a $5,000 award for Ms. Thornton and $2,500 awards each for two opt-ins, Shanta Love and Jeanous West. The Motion details "their roles in initiating the investigation and participating in litigation of this matter, including serving as claims representative, responding to counsel's questions, providing documents, reviewing data, participating in settlement discussions, reviewing the Settlement, and otherwise assisting counsel." (Doc. 63, p. 36). These Service Awards are fair and reasonable under the facts of this case and are consistent with precedent.

#### 2.  Attorneys' Fees

The attorneys' fees contemplated by the Amended Settlement Agreement constitute 17% of the gross settlement amount (i.e., the new settlement fund plus the value of forgiving the overpaid wages)—or approximately 40% of the new settlement fund—and totals $820,000. Under the Agreement, 20% of Plaintiffs' counsel's fees will be withheld until the close of the settlement administration. (Doc. 63, pp. 37–38). The Court

reiterates a unique circumstance here: Tyson has repaid *all* unpaid wages, meaning the attorneys' fees are a percentage of Plaintiffs' recovery of liquidated damages only.

i.    Scope of Review

The fees in this case are calculated as a "percentage of the benefit," so they proportionally reflect the results obtained for Plaintiffs and the putative collective members. Generally, "any authority for judicial approval of FLSA settlements . . . does not extend to review of settled attorney fees," other than "ensur[ing] (1) the attorney fees were in fact negotiated separately and without regard to the plaintiff's FLSA claim, and (2) there was no conflict of interest between the attorney and his or her client." *Vines v. Welspun Pipes Inc.*, 9 F.4th 849, 853–54 (8th Cir. 2021) (quoting *Barbee v. Big River Steel, LLC*, 927 F.3d 1024, 1027 & 1027 n.1 (8th Cir. 2019)).

There appears, however, to be some disagreement among district courts on how to apply *Vines* and *Barbee* to percentage-of-the-funds fee arrangements; that is, whether a court may review percentage-of-the-fund fee arrangements for reasonableness or only to make sure they were separately negotiated and there was no conflict of interest. *Compare Allshouse v. Joshua Agency, LLC*, 2023 WL 6166474, at *3 (W.D. Ark. Sept. 21, 2023) (Hickey, J.) ("If, however, the attorneys' fees were not negotiated separately and apart from the merits settlement, [such as in a percentage-of-the-fund approach] the Court may then review the fees for reasonableness." (citing *Vines*, 9 F.4th at 855–57)), *with Shanley v. Evereve*, *Inc.*, 2022 WL 17076753, at *9 (D. Minn. Nov. 18, 2022) (denying approval of percentage-of-the-funds attorneys' fees because they were not negotiated separately and did not avoid a conflict of interest (citing *Vines*, 9 F.4th at 858–59 (Colloton, J., dissenting))). The Court reads *Vines* as neither prohibiting percentage-of-the-fund

arrangements outright nor instructing courts to review percentage-of-the-funds fees for reasonableness. While the Eighth Circuit in *Vines* affirmed the district court's refusal to approve the settlement agreement because the attorneys' fees were not negotiated separately, 9 F.4th at 855*,* it involved substantially different facts than presented here and did not include a percentage-of-the-fund fee arrangement. *Id.*

This Court agrees with Judge Hickey and other district courts that, "[w]hen settled attorney[s'] fees are calculated as a percentage of a total FLSA settlement common fund, district courts throughout the Eighth Circuit have found that [the] limitation on fee review," set out in *Barbee*, 927 F.3d at 1027 n.1, "does not apply because, among other reasons, the fees are necessarily intertwined with the FLSA merits settlement." *Allshouse*, 2023 WL 6166474, at *3 (citing, *inter alia*, *Del Toro v. Centene Mgmt. Co., LLC*, 2021 WL 1784368, at *2 (E.D. Mo. May 5, 2021)); *see also Johnson v. Himagine Sols., Inc.*, 2021 WL 2634669, at *6 n.3 (E.D. Mo. June 25, 2021) (Mensah, M.J.); *Sandoval-Osegura v. Harvey Pallets Mgmt. Grp., LLC*, 2021 WL 2337614, at *2 n.4 (E.D. Mo. June 8, 2021) (Fleissig, J.). Therefore, in such cases, courts should assess fees for reasonableness and fairness. *Allshouse*, 2023 WL 6166474, at *3 (citing *Del Toro*, 2021 WL 1784368, at *3). In so doing, courts may consider the type of fee; the amount involved and results obtained; the novelty and difficulty of the issues; the experience, reputation, and ability of the attorneys; and awards in similar cases, among other factors. *Del Toro*, 2021 WL 1784368, at *2.

ii.  Reasonableness

As already discussed, Plaintiffs' counsel were highly qualified to represent them in this case, with extensive experience in wage-and-hour disputes and Kronos outage

litigation, in particular. Plaintiffs obtained a 162% recovery (185% if considering the forgiven overpayments), and the claims process as presented to the Court seems clear and straightforward. Given the amendments to the Agreement, it does not appear that the attorneys' fees interfered with the ability of counsel to obtain favorable results for their clients and the putative collective members.

Again, this Court emphasizes the unique facts of this case—where Tyson has already made the Plaintiffs whole through repayment of their wages. Thus, the proposed attorneys' fees take only a percentage of Plaintiffs' liquidated damages (i.e., Plaintiffs' double recovery). Seeing as the contemplated fees make up 17% of the gross settlement, they are consistent with other awards in the Eighth Circuit. *Allshouse*, 2023 WL 6166474 at *3 (first noting that attorneys' fees comprising 40% of the *total settlement* are "slightly higher" than percentage-of-the-funds fees typically awarded, then approving the fees because "any skepticism the Court might have . . . is overcome by the benefits provided to Plaintiffs, as well as the Eighth Circuit's admonition that court should give a certain amount of deference when reviewing agreed attorney[s'] fees in FLSA settlements"); *see, e.g.*, *Del Toro*, WL 1784368, at *3 (35% of the collective's gross recovery). Moreover, courts outside this circuit have approved similar percentage-of-the-funds fees in Kronos cases litigated by Plaintiffs' counsel. *See, e.g.*, *Woodruff v. Kaiser Aluminum Corp.*, No. 3:22-CV-00333, ECF 29 & 31 (approving attorneys' fees comprising just under 20% of the gross recovery, including new money and forgiveness of overpayment, and 40% of the new settlement funds). The Court additionally notes that Plaintiffs' counsel took this case on a contingency basis and that the nature of the litigation was somewhat complex.

### iii. Lodestar

The Court is less persuaded by the facial reasonableness of the lodestar in this case but several distinctions between this case and typical FLSA cases before this Court quell that concern. At the settlement hearing, the Court pointed Plaintiffs' counsel to another FLSA attorney that regularly practices before this Court as a reference point for a reasonable hourly rate. In their briefing, Plaintiffs' counsel identifies prior FLSA cases where this Court awarded the referenced-attorney $300/hour. *See, e.g.*, *Holcombe v. Midwest Outdoor Concepts, LLC*, 2023 WL 3077856, at *2 (W.D. Ark. Apr. 25, 2023); *Hill-Smith v. Silver Dollar Cabaret, Inc.*, 2020 WL 4741917, at *4 (W.D. Ark. Aug. 14, 2020); *Murdock v. McNair*, 2018 WL 6314569, at *2 (W.D. Ark. Dec. 3, 2018). As Plaintiffs' counsel aptly notes, the use of these cases "as a benchmark for reasonable hourly rates" is limited for several reasons. (Doc. 63, p. 49 n.12).

First, the overall recovery in those cases was significantly lower than the $2,050,000.00 new settlement fund ($4,823,701.62 gross settlement value) here. *See, e.g.*, *Hill-Smith*, 2020 WL 4741917, at *4 ($7,344.00); *Murdock*, 2018 WL 6314569, at *1 ($16,215.17). Second, those cases were far less complicated and involved only a single plaintiff, whereas here, the case has lasted three years and involved contested motion practice to conditionally certify a collective of approximately 17,000 individuals (which Plaintiffs won), two day-long mediations, and returning to the drawing board to renegotiate following the Court's settlement hearing. *See Holcombe*, 2023 WL 3077856, at *1 (resolved single plaintiff's claims through early settlement conference within six months of filing suit); *Hill-Smith*, 2020 WL 4741917, at *1 (seeking confirmation of an uncontested arbitration award for single plaintiff); *Murdock*, 2018 WL 6314569, at *1 (recovery on

12

default judgment for single plaintiff). Third, the Court agrees with Plaintiffs' counsel that the skill, reputation, professionalism, and experience of the attorneys in the instant case—and particularly their extensive experience with the niche of Kronos litigation—sets them apart from the attorney/firm in the cited cases, which are frequently critiqued for questionable billing practices. *See Hill-Smith*, 2020 WL 4741917, at *2 (collecting cases and stating that opinions from courts across Arkansas "highlight habits" by that firm "such as over-staffing cases, micro-managing associates, billing attorneys' rates for administrative tasks, and failing to self-audit records that are submitted to the court for reimbursement, all of which tend to inflate the time spent by attorneys beyond what the firm could reasonably bill a paying client" (citations omitted)).

For the reasons set out above, the Court agrees that Plaintiffs' counsel has set this case and themselves apart from previous cases and the referenced attorney that has received $300/hour. The Court believes, for purposes of calculating the lodestar, a blended rate of $315/hour is reasonable here. At that rate, the lodestar ratio would be 5.57 for all work done thus far and 4.94 when including the anticipated 50 additional hours it will take to wrap up administration of the settlement. While high, the Court will approve the amount requested given the unique circumstances of this case and the changes made in the amended settlement. Specifically, the fact that Plaintiffs and the putative collective have already fully recovered 100% of their unpaid wages and now seek only liquidated damages. Additionally, the Court's concerns regarding the high recovery of attorneys' fees are assuaged in this case by: the easy opt-in process; the omission of the reversion clause; the inclusion of a second distribution to opt-ins; the *cy pres*; and the withholding of 20% of the attorneys' fees until after the Final Accounting Date.

Considering the above—particularly the high recovery for collective members and the opt-in process that will encourage easy participation in the collective—the Court finds the contemplated attorneys' fees, totaling $820,000.00, are fair and reasonable.

### 3. Litigation Costs

"The Eighth Circuit has interpreted other fee-shifting statutes as going beyond [28 U.S.C. § 1920] and allowing an award of all 'reasonable out-of-pocket expenses' that would normally be charged to a fee-paying client." *Gutierrez v. 1873 Club of Texarkana*, 2022 WL 2911691, at *9 (W.D. Ark. July 22, 2022) (quoting *Sturgill v. United Parcel Serv., Inc.*, 512 F.3d 1024, 1036 (8th Cir. 2008)). "Courts have extended that rationale to FLSA cases and 'routinely grant[ ]' requests for '[r]eimbursement for reasonably incurred out-of-pocket expenses.'" *Id.* (citing *Harris v. Chipotle Mexican Grill, Inc.*, 2018 WL 617972, at *14 (D. Minn. Jan. 29, 2018)); *see also, e.g.*, *Morales v. Farmland Foods, Inc.*, 2013 WL 1704722, at *7 (D. Neb. Apr. 18, 2013) (citing *Sturgill*, 512 F.3d at 1036). Here, the Motion seeks reimbursement for out-of-pocket expenses, totaling $7,897.03, consisting of court fees, service, postage, mediation, admission and pro hac vice fees, legal research,[4] and certificates of good standing. *See* Doc. 63, p. 55. Any authorized costs that are unrealized will be left in the settlement fund and distributed to the collective. The breakdown provided to the Court appears reasonable, and Plaintiffs and putative collective members are still left with fair and reasonable recovery. Accordingly, the Court approves the reimbursement of litigation costs and expenses to Plaintiffs' counsel from the new settlement fund, as contemplated in the Amended Settlement Agreement.

---

[4] The Eighth Circuit has affirmed awards of legal research costs in cases where the "expenses are being reimbursed pursuant to a negotiated settlement," as is the case here. *In re UnitedHealth Grp. Inc. S'holder Derivative Litig.*, 631 F.3d 913, 918 (8th Cir. 2011).

## IV. CONCLUSION

**IT IS HEREBY ORDERED** that the Unopposed Motion for Approval (Doc. 62) is **GRANTED**.

**IT IS FURTHER ORDERED** that:

The Amended Settlement Agreement and Release (Doc. 63-1, pp. 1–13) is **APPROVED IN ITS ENTIRETY**, including the distributions to Plaintiffs and the FLSA Collective Members, the Service Award Payments, Plaintiffs' counsel's attorneys' fees, and the expenses of the Settlement Administrator, as set forth in the Amended Settlement Agreement, as well as Plaintiffs' counsel's expenses, as set forth in the Motion. Any amount for expenses authorized but not incurred shall be left in the Qualified Settlement Fund for distribution to the FLSA Collective Members.

The proposed Notice Form (Doc. 63-1, pp. 18–20) attached to the Settlement Release and settlement checks are authorized to be sent to the putative collective members as set forth in the Amended Settlement Agreement, provided the typographical errors mentioned *supra* are addressed.

**IT IS FURTHER ORDERED** that:

The Clerk of Court is directed to administratively terminate the case while the parties carry out the terms of the settlement agreement as approved by the Court.

The parties shall file status updates within 21 days of the close of each round of settlement distribution to the collective, with the second status update to include an estimate of the anticipated *cy pres* amount. These status updates may be filed without moving to reopen the case.

Following the close of the Final Accounting Date, Plaintiff shall move to reopen the case in order to file a list of all FLSA Collective Members, which shall be deemed to comply with the requirements for valid consent to join this action under 29 U.S.C. § 216(b). The parties may then move for dismissal.

**IT IS SO ORDERED** on this 25th day of April, 2025.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE